UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

XUGUANG CHANG, JUN NING, HAITAO
WANG a/k/a Leo Wang, and CHUAN HUI
WANG, on their own behalf and on behalf of
others similarly situated,

                  *Plaintiffs*,

     *-against-*

CK TOURS, INC d/b/a CK Tours; d/b/a Da
Xing Tours; WIN LI TOURS, INC d/b/a Win Li
Tour; d/b/a Heng Xing Tours; SKYLINER
TRAVEL & TOUR BUS CORP d/b/a Skyliner
Travel; HYON-SAK KIM a/k/a Peter Kim, and
JOANNA LAU a/k/a Kin-Ching Lau,

                  *Defendants*.

--------------------------------------------------------------X

18 Civ. 6174 (PAC)

**OPINION & ORDER**

      On the morning of April 20, 2022, minutes before the Court was set to begin jury selection

for trial in this case, the parties reported they had reached a settlement agreement, and that trial

would no longer be necessary.  The Court agreed to adjourn the matter, withdrew its request for

prospective jurors (who had already arrived at the courthouse), and ordered the parties to re-

convene the following month to finalize the settlement.

      Two days later, Defense counsel wrote the Court purporting to "revoke" the settlement,

claiming that one of the five Defendants in this case—Mr. Hyon-Sak Kim—had lacked capacity

to enter into the agreement, and asking the Court to set a new trial date.  Plaintiffs opposed that

request, and cross-moved for enforcement of the parties' original settlement agreement (the "April

20 Settlement").  This Opinion addresses both motions in tandem.

      The Court concludes that the April 20 Settlement is enforceable for two reasons.  First, the

parties each manifested an objective intent to be bound.  Second, Defendants' incapacity defense

is feeble to the point of frivolity. The Court also notes that our civil justice system would be ill-served if civil defendants were permitted to finagle their way out of trial by appearing to settle on the eve (or indeed, the morning) of trial, only to renege days later.

The Court therefore **GRANTS** Plaintiffs' motion to enforce the settlement agreement, and **DENIES** Defendants' motion to set a new trial date. The Court also **ORDERS** Defense counsel to pay assessed jury costs, and—having evaluated the parties' preliminary arguments concerning sanctions—directs Defense counsel to show cause why sanctions should not issue pursuant to Rule 11, 28 U.S.C. § 1927, and the Court's inherent sanction powers.

## BACKGROUND

The Court presumes familiarity with the factual and procedural backdrop of this case, as set forth in its prior orders. *See Xuguang Chang v. CK Tours, Inc.*, No. 18-cv-6174 (PAC), 2021 WL 1317211 (S.D.N.Y. Apr. 8, 2021). For purposes of this Opinion, it therefore focuses on the specific circumstances that prompted the instant motions. In deciding those motions, the Court relies upon facts that the parties do not dispute.[1]

Defendants' maneuvering did not begin the morning of trial. Their attempts to erect roadblocks began weeks earlier when—roughly 19 months after the Court adopted a summary

---

[1] "District courts may enforce a preliminary settlement agreement 'summarily, although the Court naturally assumes that an evidentiary hearing would be necessary if there were a genuine issue as to a material fact.'" *Gromulat v. Wynn*, No. 20-cv-10490 (VB), 2022 WL 445779, at *3 (S.D.N.Y. Feb. 14, 2022) (quoting *Lee v. Hosp. for Special Surgery*, No. 09-cv-1117 (LAK), 2009 WL 2447700, at *2 (S.D.N.Y. Aug. 11, 2009) ("The only question, then, is whether [the undisputed circumstances were] sufficient in law to give rise to a binding legal obligation.")). In this case, the parties do not dispute the circumstances surrounding the negotiation of the April 20 Settlement. They disagree only with respect to Mr. Kim's capacity. However, because, as set forth *infra*, Defendants' flimsy grounds for that defense do not amount to a viable incapacity defense, the Court deems an evidentiary hearing unnecessary.

Defendants have also made clear that they would assert attorney-client and work product protection as to evidence concerning Defense counsel's impressions of Mr. Kim's capacity, further rendering an evidentiary hearing superfluous. *See* May 25, 2022 Tr. at 20.

judgment briefing schedule, and 18 months after summary judgment motions were to be fully briefed—Defendants sought leave to file a second summary judgment motion. *See* ECF No. 104. The Court ruled that the proposed summary judgment motion was both untimely and meritless, and declined to postpone trial on that basis. *See* ECF No. 106. Then, just one week before trial, on April 13, 2022, Defendants requested that trial be adjourned, purportedly so Mr. Kim could travel to South Korea to be with his mother.[2] *See* ECF No. 119. In their initial submission to the Court (accompanied by a five-sentence affidavit and no other documentary support), Defendants claimed that Mr. Kim's mother was under "intensive treatment" and that she needed Mr. Kim at her side because he "is the only family member she has." *Id.*

That turned out, at least in large part, not to be true. At a conference that same day, Defense counsel represented that Mr. Kim in fact has a sister who was attending to their mother. April 13, 2022 Tr. at 5. They then explained that Mr. Kim's mother had suffered a "fracture in ankle and other areas of her body," which was complicated due to underlying conditions. *Id.* at 2–3. When the Court pressed counsel for details on the underlying condition, observing that it was unusual for this kind of request to be so scantly supported, counsel were unable to meaningfully elaborate. *Id.* at 4–5. The Court then denied Defendants' request to adjourn without prejudice, pending the submission of further detail and documentation. *Id.* at 5. Defendants instead withdrew the request, advising the Court that because Mr. Kim's mother was in fact unable to receive hospital visitors due to the COVID-19 pandemic, Mr. Kim had "decided to stay in the States to testify" at trial. ECF No. 121. The Court therefore continued its preparations for a trial set to begin on April 20.

That trial, like all trials in the Southern District of New York since early 2020, was to be

---

[2] In his affidavit, Mr. Kim indicated that he would "be back to the States to proceed with the case as soon as his mother recovers enough to take care of herself," but provided no further details as to timing. Kim Aff., ECF No. 119-1.

substantially constrained by the COVID-19 pandemic. To start, receiving a jury assignment in the first place was a significant milestone. Under the relevant pandemic protocols, all jury trial requests are subject to review by the assignment committee, who evaluates each request and schedules trials based on certain prioritizing factors. *See generally United States v. Tagliaferro*, No. 19-cr-472 (PAC), 2021 WL 2767154, at *1 n.1 (S.D.N.Y. July 1, 2021). Under these protocols—particularly for civil trials—a jury request may not be satisfied. Requests that the assignment committee deems to be lower priority may be given a later trial date, awarded a less favorable place in the pecking order for prospective jurors on the scheduled trial date, or deferred altogether until the next quarter's trial calendar.

The constraints do not cease once a trial has been scheduled. Prospective jurors must endure significant restrictions upon arrival at the courthouse. Beyond the ordinary (substantial) burdens imposed upon prospective jurors even outside of the pandemic context, jurors must currently, *inter alia*, fill out a COVID questionnaire each time they enter the courthouse, remain masked at all times, attempt to stay socially distanced even as they are herded into crowded courtrooms for jury selection, and otherwise absorb the risks associated with convening in indoor public spaces during a pandemic. In this case, the parties were aware of these many constraints and burdens, which were incorporated into the pre-trial jury instructions circulated in advance of trial. *See* April 13, 2022 Tr. at 16–18.

On the morning of April 20, minutes before the Court was to begin preliminary trial proceedings, the parties announced that after a flurry of last-minute negotiation, they had reached a "settlement in principle." Apr. 20, 2022 Tr. at 2, ECF No. 127. Although they did not disclose the complete terms of the agreement on the record, the parties indicated that they had agreed to "a dollar amount" and a "payment plan" moments earlier. *Id.* Plaintiffs' counsel, without dispute

4

from Defense counsel, reported that the final outstanding hurdle was the "fairly painless process" of "discuss[ing] further the remaining material terms"—specifically, deciding whether they would memorialize the deal via a settlement stipulation under Rule 41 or an offer of judgment under Rule 68. *Id.*

When the Court pressed the parties to specify what precisely remained to be finalized, Plaintiffs' counsel reiterated the stipulation/offer of judgment decision. *Id.* at 2–3. Neither party disclosed any other open terms. *Id.* at 3. When prompted for next steps, Defense counsel recommended the Court "discharge the jury because the trial is no longer needed." *Id.* at 3. Both parties answered in the affirmative, without qualification, when the Court asked: "So in 30 days you will come back with a settlement, is that correct?" *Id.*

That also turned out not to be true. Two days later, Defendants informed the Court that Mr. Kim had "withdr[awn] the acceptance of Plaintiffs' settlement offer," and "revoked the settlement." Defs.' Ltr. at 1, ECF No. 124. Requesting a new trial date, Defendants asserted that "the agreement entered on the record is not enforceable" because Mr. Kim—one of two individual defendants, alongside three corporate defendants—"took medicine which led him under undue influence in making a reasonable judgment [sic] for settlement on the trial date." *Id.* According to Defense counsel, Mr. Kim had been suffering from insomnia and "taking Zolpidem to get some sleep." *Id.* Mr. Kim had been "worried about his mother's medical condition," counsel continued, and therefore "did not have a clear mind enough to make decision [sic] to settle this case," and now "wants to proceed with trial." *Id.*

Defendants' letter was accompanied by two exhibits: (1) a picture of a bottle purported to be Mr. Kim's prescribed sleeping pills, along with (2) records and phone screenshots concerning his mother's medical conditions. *See* ECF Nos. 124-1, 124-2. Although one medical document

was accompanied by a certified translation, there was no accompanying affidavit or declaration affirming the authenticity of any of these exhibits, or otherwise substantiating the factual assertions[3] in Defendants' letter to the Court.

In their letter, Defendants also disclosed some of the details of the parties' negotiations. They reported they had accepted Plaintiffs' offer of $330,000 to settle the case. Defs.' Ltr. at 1. Plaintiffs subsequently confirmed this account of the settlement terms, and added that the parties had agreed the total would be payable over eight months, through an initial payment of $50,000 followed by seven payments of $40,000. Pls.' Ltr. at 2, ECF No. 126.

## DISCUSSION

### I.   Type I Enforceability

#### a.   Applicable Law

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *BCM Dev., LLC v. Oprandy*, 490 Fed. App'x. 409, 409 (2d Cir. 2013).[4] "The party seeking to enforce a purported settlement bears the burden of proving that such a binding and enforceable agreement exists." *Grgurev v. Licul*, No. 15-cv-9805 (GHW), 2016 WL 6652741, at *3 (S.D.N.Y. Nov. 10, 2016).

"It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150 (2d Cir. 2022) (internal quotation marks omitted). Although the Second Circuit has "declined to decide" whether federal or state law applies when determining the enforceability of

---

[3] Defendants would eventually submit, alongside their oral argument briefing, an affidavit from Mr. Kim tracking the language submitted by counsel in the April 22 letter. *See* ECF No. 130-3.

[4] Summary order (quoting *Meetings & Expositions Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974)).

settlement agreements, it has characterized the distinction as academic because the two bodies of law are "materially indistinguishable" in this area. *Id.* at 129 n.1; *see Sprint Commc'ns Co. L.P. v. Jasco Trading, Inc.*, 5 F. Supp. 3d 323, 328 (E.D.N.Y. 2014) ("As a result, Courts apply New York and federal common law interchangeably.") (cleaned up); *accord Marett v. Metro. Transportation Auth.*, No. 19-cv-5144 (GBD) (RWL), 2020 WL 8671951, at *5 (S.D.N.Y. Nov. 24, 2020)[5] (quoting *McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232, 237 (S.D.N.Y. 2006)).

In *Murphy*, the Second Circuit recently reiterated the standards that courts apply when determining whether, and to what extent, to enforce "preliminary" settlement agreements. *Murphy*, 32 F.4th at 150–51. Although courts should "avoid trapping parties in surprise contractual obligations," the *Murphy* court emphasized that it is "equally important" that courts "enforce and preserve" preliminary agreements that "were intended as binding, despite a need for further documentation or further negotiation." *Id.* at 151.

The Second Circuit has recognized two species of preliminary agreements. A "Type I" agreement "occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation." *Id.* at 150. Such an agreement "is preliminary only in the sense that the parties desire a more elaborate formalization of the agreement, which, although not necessary, is desirable." *Id.* By contrast, "Type II preliminary agreements do not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." *Cambridge Cap. LLC v. Ruby Has LLC*, No. 20-cv-11118 (LJL), 2021 WL 4481183, at *9 (S.D.N.Y. Sept. 30, 2021) (quoting *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005)). Both agreement types are enforceable, but in different ways, and subject to different

---

[5] *Report and recommendation adopted*, 2021 WL 961760 (S.D.N.Y. Mar. 15, 2021).

damages in the event of a breach. *See CapLOC, LLC v. McCord*, No. 17-cv-5788 (AT), 2020 WL

1036044, at *20 (S.D.N.Y. Mar. 3, 2020) (reliance damages, but no "benefit-of-the-bargain"

damages, available for a Type II breach).

Whether, and to what extent, a settlement agreement is enforceable as a Type I agreement

is a question of law. *See Murphy*, 32 F.4th at 150. Courts in this Circuit typically approach that

question using the so-called *Winston* factors. The four *Winston* factors are:

> 1) whether there has been an express reservation of the right not to be bound in
> the absence of a writing; (2) whether there has been partial performance of the
> contract; (3) whether all of the terms of the alleged contract have been agreed
> upon; and (4) whether the agreement at issue is the type of contract that is
> usually committed to writing.

*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). "[N]o single factor is decisive,

but each provides significant guidance." *Marett*, 2021 WL 961760, at *2 (quoting *Ciaramella v.

Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997)).[6] Moreover, "while these factors may

be helpful, the ultimate issue, as always, is the intent of the parties: whether the parties intended

to be bound, and if so, to what extent." *Murphy*, 32 F.4th at 151.

Although in *Murphy*, the Second Circuit dealt with a preliminary written settlement

agreement, "[t[he Second Circuit has held that parties may enter into a binding settlement

agreement orally" as well. *Velazquez v. Yoh Servs., LLC*, No. 17-cv-00842 (CM), 2017 WL

4404470, at *3 (S.D.N.Y. Sept. 25, 2017) (citing *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir.

2007). To determine the enforceability of a preliminary oral agreement, courts look to the "intent

of the parties, as demonstrated by their 'words and deeds.'" *Massie v. Metro. Museum of Art*, 651

F. Supp. 2d 88, 93 (S.D.N.Y. 2009) (quoting *Winston*, 777 F.2d at 80). As with other agreements,

---

[6] Courts also apply "a modified five-factor version of that test when considering whether
something is a Type II agreement." *Murphy*, 32 F.4th at 151.

that inquiry may be informed by the *Winston* factors, but only as a means to the ultimate end: determining and enforcing the parties' legitimately bargained expectations. *See Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 423 (S.D.N.Y. 2012) ("Evaluating these [*Winston*] factors . . . is not a talismanic scorecard.") (quoting *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008)).

### b. Analysis

In determining whether a Type I, enforceable settlement agreement exists in this case, the Court routes its analysis through the *Winston* factors. Because it concludes that an enforceable Type I agreement was formed, it does not undertake any Type II analysis.

### 1. *Winston* Factor One: Express Reservation Not to Be Bound

Although no single *Winston* factor is dispositive—and indeed, the *Winston* factors themselves are but a template to guide the Court's analysis of the parties' intent—courts typically allocate outsized weight to whether either party expressly reserved their right not to be bound absent a writing. *See, e.g.*, *Gromulat v. Wynn*, No. 20-cv-10490 (VB), 2022 WL 445779, at *3 (S.D.N.Y. Feb. 14, 2022) ("Between the so-called '*Winston* factors,' the first factor "is frequently the most important.'") (quoting Brown, 420 F.3d at 154).

In this case, neither party seriously claims it expressly reserved the right not to be bound absent a writing. At the April 20 conference, neither party voiced any such caveat; to the contrary, both sides asserted, without reservation, that there was no need for a trial. Nor did Defendants contend at oral argument that they had made any such reservation. Instead, they simply reiterated the legal argument they had briefed: that because the parties had not yet determined whether to proceed by settlement stipulation or offer of judgment, either of which would typically involve a

writing of some sort, the parties implicitly reserved their right not to be bound absent a writing.[7] *See* Defs.' Mem. at 3, ECF No. 130.

But the first *Winston* factor does not ask whether the parties *implicitly* reserved their right not to be bound. It asks whether they *expressly* did so. The *Winston* court itself made this point perfectly plain, holding that the "mere intention to commit an agreement to writing will not prevent contract formation prior to execution." *Winston*, 777 F. 2d at 80. Here, there was no such reservation, and, thus, the oft-influential first *Winston* factor weighs in favor of enforcement.

### 2. *Winston* Factor Two: Partial Performance

So too does the second *Winston* factor: partial performance of the contract. "When both parties stop actively litigating the case based on the apparent settlement, courts may construe this as partial performance." *Geneva Lab'ys Ltd. v. Nike W. Afr. Imp. & Exp. Inc.*, No. 19-cv-4419 (EK) (RER), 2021 WL 7287611, at *6 (E.D.N.Y. Aug. 16, 2021) (recommending enforcement where the parties had "orally agreed to all material terms for settlement" on the court's record, only to later reach an impasse over "non-financial" written terms)[8]; *see also Velazquez*, 2017 WL 4404470, at *3 ("Plaintiff performed on the agreement by declining to file her motion for conditional class certification."); *Alvarez v. City of New York*, 146 F. Supp. 2d 327, 336 (S.D.N.Y. 2001) ("[T]here also was partial performance of the agreement in the sense that both sides, relying on the apparent settlement, did not resume active litigation of the case.").

Here, the parties partially performed by jointly making the rather extraordinary request that the Court adjourn trial *minutes* before kickoff, in direct and immediate reliance on the settlement.

---

[7] *See* May 25, 2022 Tr. at 3–5 ("MR ZHU: . . . Plus, on that day, parties had expressly mentioned to the Court that parties were going to proceed either by settlement agreement or by a[n] offer of judgment that expressed the reservation to proceed with a written agreement.").

[8] *Report and recommendation adopted*, No. 19-cv-04419 (EK) (RER), 2022 WL 673257 (E.D.N.Y. Mar. 7, 2022).

*See Junjiang Ji v. Jling Inc.*, No. 15-cv-4194 (SIL), 2019 WL 1441130, at *12 (E.D.N.Y. Mar. 31, 2019) ("Defendants partially performed by agreeing to adjourn the ongoing trial.").

Thus, the second *Winston* factor weighs heavily in favor of enforceability.

### 3. *Winston* Factor Three: Existence of Open Terms

The third *Winston* factor, by contrast, does not weigh decidedly in either side's favor. To be sure, it is undisputed that the parties had agreed upon the "single most important term of the agreement, the settlement amount." *Gildea v. Design Distributors, Inc.*, 378 F. Supp. 2d 158, 161 (E.D.N.Y. 2005). The parties had also agreed upon what was apparently the second most contentious item: the payment schedule. By both parties' accounts, the eleventh-hour haggling centered around these two terms.

Those accounts align neatly with the parties' statements to the Court on April 20. At that time, they reported that the only item left to be decided was whether they would proceed through a Rule 41 stipulation, subject to the Court's fairness review, *see Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, or through a Rule 68 offer of judgment. The Court asked the parties multiple times to clarify what precisely was left to be done, and the parties identified only this single strategic decision.

Only afterwards did Defendants belatedly flag the scope of release as an item that still needed to be negotiated as of April 20. This issue—which Defendants neglected to voice at the April 20 conference, or in their subsequent submissions purporting to "revoke" the settlement, or in their briefing prior to oral argument—was first raised at oral argument. *See* May 25, 2022 Tr. at 2. For their part, Plaintiffs did not dispute at oral argument that there had been no explicit agreement on the precise scope of release. *See id.* at 7.

11

But although the existence of open terms is "a factor tending against the conclusion that the parties have reached a binding agreement, . . . the parties' intent is ultimately controlling." *Vacold*, 545 F.3d at 128. "[I]f the parties intended to be bound despite the presence of open terms, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations, provided that the agreement is not so fragmentary as to be incapable of sustaining binding legal obligation." *Id.* (internal quotation marks omitted); *see Murphy*, 32 F.4th at 151–53 (noting that "where there is no evidence to suggest that those new terms were considered open issues in need of negotiation" at the time of agreement, "a party cannot reopen a deal by proposing additional terms at a later date").

This guidance controls here. The Court concludes that the parties objectively intended to be bound by their settlement, even absent an explicit agreement as to the scope of release. *See Murphy*, 32 F.4th at 151 ("[I]t is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation *or further negotiation*.") (internal quotation marks omitted) (emphasis added). The parties had agreed to a settlement amount, a payment plan, and a sufficiently concrete understanding of the release to allow both parties to comfortably declare to the court that the case was settled "in principle" and there was no need for a trial.[9] Any lingering efforts to craft a precise release term cannot operate as an escape hatch for Defendants, permitting them to retroactively renounce the parties' clear, legitimately bargained expectation that each would be bound by the agreed-upon terms. *See Deutsche Bank Sec. Inc. v. Kingate Glob. Fund Ltd.*, No. 19 CIV. 10823 (ER), 2021 WL 1163715, at *8 (S.D.N.Y.

---

[9] Defendants' contention at oral argument that the April 20 Settlement lacked consideration fizzles on this point. May 25, 2022 Tr. at 15. Even without an express release term, Plaintiffs plainly provided consideration in agreeing to cease prosecuting their claims in this case. *See In re Drexel Burnham Lambert Grp., Inc.*, 159 B.R. 420, 426 (S.D.N.Y. 1993) ("The surrender of even a doubtful claim provides adequate consideration for an agreement . . . .").

12

Mar. 26, 2021) (where contracting parties had agreed to terms as to what was being sold, the amount being sold, and the price, they intended to be bound in spite of other open terms); *Deephaven Distressed Opportunities Tradings, Ltd v. 3v Capital Master Fund Ltd*, No. 590803/08, 2011 WL 11415362 (N.Y. Sup. Ct. Oct. 27, 2011) (preliminary agreement enforceable despite being subject to the future "negotiation, execution and delivery of a reasonably acceptable assignment agreement containing customary provisions for a sale such as this").

This conclusion is buttressed by the purpose underlying fairness review of release clauses—to protect *plaintiffs* from being fleeced into an "overly broad release." *Brittle v. Metamorphosis, LLC*, No. 20 CIV. 3880 (ER), 2021 WL 606244, at *3 (S.D.N.Y. Jan. 22, 2021); *Camacho v. Ess-A-Bagel, Inc.*, No. 14-cv-2592 (LAK), 2014 WL 6985633, at *4 (S.D.N.Y. Dec. 11, 2014) ("[A]n employer is not entitled to use an FLSA claim . . . to leverage a release from liability unconnected to the FLSA.") (internal quotation marks omitted). In FLSA contexts, courts have "an obligation to police unequal bargaining power between employees and employers," and therefore "routinely reject release provisions that waive practically any possible claim against the defendants, including unknown claims and claims that have no relationship whatsoever to wage-and-hour issues." *Martinez v. Gulluoglu LLC*, No. 15 CIV. 2727 (PAE), 2016 WL 206474, at *2 (S.D.N.Y. Jan. 15, 2016) (internal quotation marks omitted). The Court is therefore loath to permit the *Defendants* in this case to weaponize the prospective fairness review of a release clause as a tool to avoid honoring their own promises.

In any event, the Court is hard-pressed to believe that either party would have agreed to shoulder the delays and risks associated with adjournment if the scope of release was still seriously in question. But the Court need not speculate as to the parties' subjective thoughts—it is enough that they objectively manifested an intent to be bound. *See Alessi Equip., Inc. v. Am. Piledriving*

*Equip., Inc.*, No. 18 CIV. 3976 (JCM), 2022 WL 63165, at *16 (S.D.N.Y. Jan. 6, 2022) (in determining whether parties intended to be bound, "the court looks not to the parties' after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds *at the time of contracting*") (cleaned up) (emphasis added).

In sum, the Court does not deem the presence of one open term to operate as a *per se* bar against enforcement of the April 20 agreement. Nonetheless, its presence precludes the third *Winston* factor from weighing firmly in Plaintiffs' favor. With the presence of that open term set against a slew of indicators that the parties intended to be bound notwithstanding this bit of outstanding business, the Court deems the third *Winston* factor to be neutral.

### 4. *Winston* Factor Four: Type of Agreement Typically Committed to Writing

Only Factor Four—whether the agreement at issue is the type of contract that is usually committed to writing—weighs decidedly against enforceability. On this point, the underlying FLSA context looms large.

Typically, Factor Four concerns itself with the complexity of the agreement, and whether that complexity suggests the need for a writing. *See, e.g., Est. of Andrea Brannon v. City of New York*, No. 14-cv-2849 (AJN), 2016 WL 1047078, at *3 (S.D.N.Y. Mar. 10, 2016); *Walker v. City of New York*, No. 05-cv-0004 (JBW), 2006 WL 1662702, at *9 (E.D.N.Y. June 15, 2006). Here, because the agreement primarily concerned a total dollar amount and a straightforward payment plan, the typical Factor Four analysis would not seem to necessarily suggest a writing.

The FLSA context changes this calculus. Because FLSA settlements "require[] judicial approval to be enforceable, the settlement at issue presents a distinct situation not contemplated by the Court in *Winston* or later Second Circuit cases."[10] *Velazquez*, 2017 WL 4404470, at *4.

Courts in this Circuit have addressed this concern in a few different ways. As a preliminary matter, there is very little direct Second Circuit guidance on point. In *Velazquez*, Judge McMahon identified only one Second Circuit case implicating these issues: a summary order in which the court found the agreement at issue unenforceable on "unrelated grounds." *See* 2017 WL 4404470, at *4 (citing *Kaczmarcysk v. Dutton*, 414 Fed. Appx. 354, 355–56 (2d Cir. 2011) (analyzing the first *Winston* factor only)). The parties have not identified, nor has the Court uncovered, any additional Second Circuit precedent on this question.

The majority of district courts in this Circuit confronting this question have "collapsed the issue into the fourth *Winston* factor." *Velazquez*, 2017 WL 4404470, at *4. That is to say: because FLSA settlements are subject to judicial review, parties naturally contemplate that the agreement will be reduced to a writing and submitted to the court for approval. Courts have typically found that this context tips the fourth *Winston* factor against the enforcement of purported oral settlement agreements. *See, e.g., Alvarado v. Five Town Car Wash, Inc.*, No. 13-cv-1672 (RJD), 2014 WL 252015, at *2 (E.D.N.Y. Jan. 22, 2014) (oral FLSA settlement agreement not binding on the balance of all four *Winston* factors, including the fourth factor, which weighed against enforcement because "the parties here could not have effectively consummated [an FLSA] settlement without

---

[10] Plaintiffs underscore that the parties had not agreed that they would proceed by way of a settlement stipulation subject to fairness review. *See* Pls. Mem. at 12, ECF No. 131 (citing *Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 398 (2d Cir. 2019) ("[J]udicial approval is not required of Rule 68(a) offers of judgment settling FLSA claims.")). But settlements pursuant to Rule 68 are also typically committed to writing. *See* Fed. R. Civ. P. 68(a) ("If, within 14 days after being served, the opposing party serves *written* notice accepting the offer, either party may then *file* the offer and notice of acceptance, plus proof of service.") (emphases added).

reducing the terms of their agreement to writing"); *Velazquez*, 2017 WL 4404470, at *4 ("In sum, two of the four *Winston* factors weigh strongly against enforcement, and one of these factors—the fourth—is, in my opinion, dispositive."); *Junjiang Ji*, 2019 WL 1441130, at *12 (declining to enforce an oral FLSA agreement: "the fourth factor weighs heavily against enforcement because agreements to settle FLSA claims are virtually always memorialized in writing").[11]   However, at least one court has ordered the enforcement of an oral FLSA settlement on the balance of all four *Winston* factors, relying on the particular circumstances through which the parties reached and reported the oral agreement to the court.  *See Rahman v. Kaplan Cornelia, Inc.*, No. 12-cv-09095 (SN), 2014 WL 541851, at *7 (S.D.N.Y. Feb. 11, 2014) (even as "a settlement agreement of this nature is normally reduced to writing," the parties' "intent to be bound by the oral agreement" was indicative from their interactions with the court).

The Court adopts this sensible approach, and considers the FLSA context in the context of the fourth *Winston* factor.  But while this factor assuredly weighs against enforceability, it does not—under these exceptional circumstances—overcome the balance of the other *Winston* factors weighing strongly in favor of enforceability. After all, "[t]he *Winston* analysis would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written"—and stranger still if a single anti-enforcement factor always

---

[11] A few courts have treated *Cheeks* as a standalone hurdle, outside the context of the *Winston* factors.  *See Nunez v. Shinobi NY LLC*, 2013 WL 12107728, at *3 (S.D.N.Y. Sept. 13, 2013) (dismissing defendants' contention that an oral FLSA settlement could be binding, deeming it "contrary to the FLSA's policy of protecting plaintiffs"); *Hernandez v. Fresh Diet Inc.*, No. 1:12-cv-4339 (ALC), 2017 WL 4838328, at *5 (S.D.N.Y. Oct. 25, 2017) ("[A] fully executed settlement agreement has not been submitted to the Court for *Cheeks* approval and the Court has not endorsed the stipulation of dismissal.  Therefore, the [written FSLA settlement signed by only one party] is not binding.").   Because these cases confronted distinct circumstances, and because this 'standalone' approach cuts against the weight of case law intuitively analyzing the *Cheeks* issue within the context of the fourth *Winston* factor, the Court declines to follow this template.

trumped a pro-enforcement balance of the other factors. *See Brannon*, 2016 WL 1047078, at \*4 (internal quotation marks omitted).

The Court therefore concludes, on the balance of all four *Winston* factors, that the parties intended to be bound by the April 20 Settlement, and that they therefore entered into a Type I agreement that is enforceable as a matter of law.

## II.    Incapacity

Having concluded that the April 20 Settlement is enforceable as a matter of law, the Court turns next to Defendants' incapacity defense.

Although "contracts of a mentally incompetent person who has not been adjudicated insane are voidable" under New York law, capacity to contract is "presumed." *Manhattan Cryobank, Inc. v. Hensley*, No. 19-cv-3370 (PGG), 2020 WL 4605236, at \*3 (S.D.N.Y. Aug. 11, 2020) (quoting 5 WILLISTON ON CONTRACTS § 9:1 (4th ed.)).  To carry the "extremely heavy" burden of rebutting this presumption, the party purportedly lacking capacity must show: (1) that his "mind was so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction," and (2) that the other contracting party "knew or should have known of his condition." *Pucilowski v. Spotify USA, Inc.*, No. 21-cv-1653 (ER), 2022 WL 836797, at \*7 (S.D.N.Y. Mar. 21, 2022).

As an initial matter, the Court notes that Defendants appear to have abandoned their incapacity defense.  Although they raised it in their April 22 letter initially apprising the Court that the settlement had been "revoked," their subsequent briefing makes no mention of it.  When questioned about the incapacity issue at oral argument, Defense counsel suggested that Defendants were only pursuing the argument in the context of Plaintiffs' request for sanctions.[12]

_____

[12] *See* May 25, 2022 Tr. at 3–4:

But even taking Defendants' initial contention at face value, they have failed to establish a valid incapacity defense. Defendants rely upon unauthenticated exhibits that—even if believed—would not establish that Mr. Kim was "absolutely incompetent to comprehend and understand the nature" of this settlement. *Pucilowski*, 2022 WL 836797, at *7. Defendants cite no authority for the proposition that fatigue, the use of sleeping pills, or concern over a family member's health are sufficient for such a finding. And even if their showing as to actual incapacity were less flimsy, Defendants have entirely neglected to address why Plaintiffs "knew or should have known" of Mr. Kim's condition. *Id.* After all, if that condition eluded even Mr. Kim's own counsel—who are presumed to have had apparent authority to settle this case—how could it have been apparent to Plaintiffs or their counsel? *See Gomez v. City of New York*, No. 13-xc-1822 VSB, 2015 WL 1402193, at *7 (S.D.N.Y. Mar. 26, 2015) ("Though the decision to settle a case rests with the client, there is a presumption that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had the authority to do so.") (quoting *In re Artha Mgmt. Inc.*, 91 F.3d 326, 329 (2d Cir. 1996)).

The Court therefore declines to void the agreement on incapacity grounds.

## III.    Sanctions and Costs

### a.    Sanctions

District courts are empowered to impose sanctions and award costs under several strains of authority. First, "any federal court may exercise its inherent power to sanction a party or an

---

THE COURT: What about Mr. Kim [sic] so-called incapacity defense?

MR. ZHU: That goes to the plaintiff's request to impose sanction against defendants. There is no bad faith from my client. At least—he's under certain influence by his medical, and he did not act in bad faith nor there is any clear evidence showing the bad faith, so defendant request the Court to decline to impose sanction under the Court [sic] inherent power under Section 1927.

18

attorney who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (cleaned up).  When invoking its inherent sanction powers, "the district court must make an explicit finding of bad faith." *Wilson v. Citigroup, N.A.*, 702 F.3d 720, 724 (2d Cir. 2012) (internal quotation marks omitted)

Second, 28 U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Sanctions pursuant to 28 U.S.C. § 1927 are appropriate only where the court has made "a finding of conduct constituting or akin to bad faith." *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 591 (2d Cir. 2016) (internal quotation marks omitted) ("The attorney's actions must be so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.").

Finally, a court may sanction an attorney pursuant to Rule 11(c) of the Federal Rules of Civil Procedure if it "determines the attorney has violated [Rule 11(b)] or is responsible for the violation." Rule 11(b), in turn, provides in relevant part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; . . .
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

These three sources of sanction authority require that the parties facing potential sanctions be given adequate notice and an opportunity to respond as to why specific conduct is not worthy

of sanction. *See* Fed. R. Civ. P. 11(c)(3) ("On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)."); *Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009) (before suffering sanctions pursuant to 28 U.S.C. § 1927, a party must receive notice as to "(1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered," and must be given an opportunity to respond "by brief or oral argument" or, if necessary, through an evidentiary hearing); *In re Gravel*, 6 F.4th 503, 516 (2d Cir. 2021) ("Inherent power is constrained: it requires caution and notice before use . . . .") (internal quotation marks omitted).

Although the Court has already solicited and reviewed preliminary arguments from the parties on the matter, out of an abundance of caution, the Court declines to impose sanctions at this time.  Instead, to ensure that counsel are given sufficiently specific notice of the potential sanctions they—not their clients—face in this case, and an opportunity to respond, the Court orders Defense counsel to show cause why they should not be sanctioned pursuant to Rule 11, 28 U.S.C. § 1927, and the Court's inherent sanction powers, for the following reasons:

Specifically, the Court orders Defense counsel to show cause why their scantly (and improperly) supported filings concerning Mr. Kim's purported incapacity are not sanctionable pursuant to Rule 11(b)'s requirement that filings submitted by attorneys to the Court should reflect information "formed after an inquiry reasonable under the circumstances" and presented with "evidentiary support."

Additionally, the Court orders Defense counsel to show cause why their conduct surrounding the April 20 settlement is not sanctionable pursuant to 28 U.S.C. § 1927 and the Court's inherent sanction powers.  Specifically, the Court notes that Defense counsel appear either

(1) to have been complicit to a bad faith scheme to delay trial by feigning settlement, only to renege once trial had been warded off[13]; or (2) to, at best (accepting Defendants' narrative), have blithely neglected to inquire as to their client's capacity prior to settling on his behalf—to the detriment of Plaintiffs, the Court, and Mr. Kim himself. Defense counsel are ordered to show cause as to why either reality is not sanctionable under 28 U.S.C. § 1927 and the Court's inherent sanction powers.

Relatedly, Plaintiffs are directed, within 14 days of this Opinion, to prepare and serve on Defendants and the Court a detailed accounting of costs incurred as a result of Defense counsel's prospectively sanctionable conduct. Defense counsel may incorporate any objections to the imposition of these costs in their response to the Court's order to show cause.

### b. Jury Costs

Under Local Civil Rule 47.1, "[t]he Court may, in its discretion, assess the parties or counsel with the cost of one day's attendance of the jurors if a case is settled after the jury has been summoned." The Court has calculated the cost of attendance of its prospective jurors on April 20

---

[13] The Court notes that this case echoes a larger pattern of similar behavior from Hang & Associates, including counsel of record Jian Hang. *See, e.g., Lopez v. Blue White Laundromat, Inc.*, No. 13-cv-01366 (FM), ECF No. 44, at *5 (S.D.N.Y. May 22, 2014) ("Mr. [Jian] Hang subsequently contacted Plaintiffs' counsel and indicated that the Defendants would not honor the agreement reached at the settlement conference . . . ."); *Tian v. Ollies 42nd LLC*, No. 15-cv-5499 (PKC), 2016 WL 6900684, at *3 (S.D.N.Y. Nov. 22, 2016) (sanctioning a client of Hang & Associates and Jian Hang because their client's "noncompliance with the Court's Orders was willful, as demonstrated by [the client's] return to China without indication when he would return. . . . [The client] was originally scheduled to be deposed on February 25, 2016, and it was only the night before that plaintiff's counsel informed defendant's counsel that [the client] would not appear."); *Lian v. Great New Evergreen Cafe Inc.*, No. CV ADC-20-2596, 2021 WL 6339602, at *3 (D. Md. Sept. 16, 2021) (sanctioning a client of Hang & Associates and Jian Hang because their clients "acted in bad faith in failing to appear in Maryland for their depositions. They had proper notice and even had counsel cancel the day before the depositions."); *see also Li Ming Yan v. Hunan Gourmet, Inc.*, No. 17-cv-928, 2019 WL 3021734, at *3 (N.D. Fla. Apr. 29, 2019) (declining to sanction Hang & Associates, including Jian Hang, because there was insufficient evidence to conclude counsel had deliberately allowed the court to be misled, but noting that Mr. Hang had made "concerning" misrepresentations in open court), *report and recommendation adopted*, No. 17-cv-928, 2019 WL 3017775 (N.D. Fla. July 10, 2019).

to be $3,056.72.  Because the Court finds that Defense counsel are primarily responsible for the bait-and-switch surrounding the April 20 Settlement, which in turn triggered Defendants' current request for a second trial date to be set (and a second jury summoned), the Court exercises its discretion to impose these costs against Defense counsel only.

The Court reiterates that our civil justice system simply cannot function properly if it can be so easily short-circuited by parties appearing to settle cases, only to promptly unsettle them after evading trial.  Imposing the costs associated with such attempts is one small safeguard courts can leverage to protect not just the affected parties in this case, but all civil litigants, and the courts themselves.

It also vindicates the hefty and unnecessary burden levied upon the prospective jurors who made the trek to the courthouse on the morning of April 20.  The conduct here would reflect an unacceptably cavalier attitude towards these citizens serving a vital civic role even outside of the COVID context.  It is doubly offensive given the many risks and burdens imposed by the pandemic.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion to enforce the April 20 Settlement is granted and  Defendants' motion to schedule a new trial date is denied.  The Court effectively restores the parties to their respective positions immediately prior to Defendants' attempt to "revoke" the settlement. They may proceed either through fairness review of the deal—which the Court expects it will approve—or through an offer of judgment under Rule 68, subject to the Court's order at ECF No. 123.  *See Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) ("[T]here is a strong presumption in favor of finding a settlement fair, as the Court is generally not in as good a position as the parties to determine the reasonableness of an

FLSA settlement.") (internal quotation marks omitted).

Plaintiffs are directed, within 14 days of this Opinion, to prepare and serve on Defendants and the Court a detailed accounting of the costs incurred as a result of Defense counsel's prospectively sanctionable conduct, as described above.

Defendants are further ordered to show cause within 30 days of this Opinion why sanctions should not issue for the reasons set forth above.  This submission may also include any objections to Plaintiffs' reported costs.

Finally, Defense counsel are directed to make a payment of $3,056.72 within thirty days of this Opinion, payable by check to the Office of the Clerk.


Dated: New York, New York  
      June 6, 2022

SO ORDERED

_____  
HONORABLE PAUL A. CROTTY  
United States District Judge